Angela New v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-506-CR

ANGELA NEW APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

I.  Introduction

A jury convicted Appellant Angela New of the first-degree felony offense of intentionally or knowingly causing serious bodily injury to a child.  The jury assessed punishment at ninety-nine years’ confinement, and the trial court sentenced her accordingly.  In four issues, New complains that the trial court erred by (1) granting the State’s motion in limine restricting her voir dire, (2) denying her challenges for cause and allowing unqualified jurors to sit on the jury, (3) permitting her conviction based on insufficient evidence of mental intent to commit the offense of injury to a child, and (4) admitting photographs that were more prejudicial than probative.  We will affirm.

II.  Factual Background

A baby boy, Kobe New (Kobe), was born on August 23, 2000 in Georgia to Jennifer Ankrom and Phillip New (Phillip), who were never married.  Ankrom testified that Kobe went to live with Phillip, Appellant Angela New (New), and her two children around October 2002.  Kobe died on February 15, 2003; New was the only adult present at the time Kobe received his deadly injury.

New told the police and the paramedics several versions of the events surrounding Kobe’s death.  Ultimately, she wrote out a statement that was read to the jury:

I was real frustrated with my daughter.  She was crying a lot for no reason, if I didn’t pick her up or change her diaper or if she didn’t get her way.  I went to the bedroom to try and calm down.  Then I heard Kobe crying, which got me even more frustrated.  I went to the living room to tell him to stop crying.  And every time I told him to stop crying, he got louder.  So I shook him a little bit.  And when he didn’t stop crying, I hit him on the forehead twice with my palm.  With the second hit, he fell and his head hit [on] the hard part of the couch.

I didn’t realize anything because I was so mad.  Then I grabbed him and shook him some more.  I guess his head was hitting the floor.  I stopped and tried to get him to stand up but he couldn’t.  Then I--then I looked at him and his eyes looked weird, so I picked him up and started to rub his hair and call his name.  When he didn’t respond, I took off his clothes and turned on the water from the tub and dipped his head into it.  Then I laid him on the floor and started pushing in his stomach or lungs with my fingers to get him to breathe.  Then I called the ambulance.  When I get mad and frustrated, I can see what I’m doing but for some reason I can’t stop myself no matter how hard I try.

After hearing the above statement, as well as testimony from the paramedics, the pediatric radiologist, other medical personnel, and the police, the jury found New guilty and assessed her punishment at ninety-nine years’ confinement.  This appeal followed.

III.  Trial Court Properly Granted Motion in Limine and Properly Denied Challenges for Cause

Before trial, the State submitted a motion in limine requesting that New approach the bench and obtain a ruling before referring to various facts in voir dire, including that New was Kobe’s stepmother, that Kobe had died or other facts relating to the nature of Kobe’s injury, and Kobe’s age.  The trial court granted the State’s motion in limine.  

During voir dire, New’s counsel attempted on several occasions to pinpoint whether venire members could consider the entire range of punishment (specifically, five years’ probation) regardless of the type of case (e.g., whether there was slight abuse or death of the child).  The State objected several times to the wording of New’s counsel’s questions, and other times he was able to ask the question without objection. 

Several venire members explained that they could not consider five years’ probation if the result of the serious bodily injury was the death of the child;  however, they stated that they could consider the full range of punishment for the crime charged—serious bodily injury to a child.  New’s counsel raised challenges for cause on venire members Mr. Wilson and Mr. Shivers, and the trial court denied the challenges.  New’s counsel exercised a peremptory strike on Mr. Wilson and requested additional peremptory strikes.  The trial court denied that request.  New’s counsel explained that he was left with objectionable jurors on the panel
(footnote: 1) and moved to quash the entire jury panel based on comments made by venire members with regard to the range of punishment and type of offense involved.  The trial court denied the request. In her first issue, New argues that the trial court abused its discretion by granting the State’s motion in limine restricting her voir dire.  Specifically, New complains that she was not allowed to inquire as to the death of the child during voir dire.  Consequently, New argues in her second issue that the trial court erred and abused its discretion by denying challenges for cause to the venire members who responded that they could not be fair and impartial if facts were made known that the criminal offense resulted in the death of the child.
(footnote: 2)
 A. Propriety of Ruling on Motion in Limine

A ruling on a motion in limine does not purport to be one on the merits but one regarding the administration of the trial.  
Harnett v. State
, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref’d).  The granting of a motion in limine will not preserve error.  
Wilkerson v. State
, 881 S.W.2d 321, 326 (Tex. Crim. App.), 
cert. denied
, 513 U.S. 1060 (1994).  Therefore, it is necessary that an objection be made when the subject is raised.  
Id.
 

The trial court has broad discretion over the process of selecting a jury.  
Barajas v. State
, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002); 
Allridge v. State
, 762 S.W.2d 146, 167 (Tex. Crim. App. 1988).  The main reason for this is that voir dire could go on forever without reasonable limits.  
Barajas
, 93 S.W.3d at 38; 
Faulder v. State
, 745 S.W.2d 327, 334 (Tex. Crim. App. 1987).  We leave to the trial court’s discretion the propriety of a particular question, and the trial court’s decision will not be disturbed absent an abuse of discretion.
  
Barajas
, 93 S.W.3d at 38; 
Allridge
, 762 S.W.2d at 163; 
Faulder
, 745 S.W.2d at 334.  A trial court’s discretion is abused only when a proper question about a proper area of inquiry is prohibited.  
Barajas
, 93 S.W.3d at 38; 
Allridge
, 762 S.W.2d at 163.

A question is proper if it seeks to discover a juror’s views on an issue applicable to the case.  
Barajas
, 93 S.W.3d at 38; 
Smith v. State
, 703 S.W.2d 641, 643 (Tex. Crim. App. 1985).  An otherwise proper question is impermissible, however, if it attempts to commit the juror to a particular verdict based on particular facts.  
Barajas
, 93 S.W.3d at 38-39; 
Standefer v. State
, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001).

The complaint in New’s first issue is unclear because the record reflects that her counsel was permitted to ask the very questions that she claims the trial court precluded, that is, questions about the impact of the child’s death on jurors’ ability to consider probation.  
See
 Appendix to opinion.  Consequently, the questions that the trial court prohibited did not harm New because several versions of the same question were put before the panel
.  
See Cook v. State
, 398 S.W.2d 284, 288 (Tex. Crim. App.) (holding that no harm was shown to have resulted from court’s refusal to allow counsel to ask questions of veniremen when qualifications to bill of exception disclosed that counsel had been permitted to ask similar questions), 
cert. denied
, 384 U.S. 966 (1966).  With regard to additional questions that New’s counsel wanted to ask or that he raised at the bench conference near the beginning of Mr. Wilson’s questioning during voir dire, the error, if any, was not preserved because the record does not reveal what was said at the bench.  
See Brazzell v. State
, 481 S.W.2d 130, 132 (Tex. Crim. App. 1972).

Therefore, the trial court did not abuse its discretion in granting the State’s motion in limine.  We overrule New’s first issue.

B. Propriety of Ruling on Challenges for Cause

We review the ruling of a trial court on a challenge for cause based on a venireperson’s bias for an abuse of discretion.
(footnote: 3)  
Williams v. State
, 773 S.W.2d 525, 536 (Tex. Crim. App. 1988), 
cert. denied
, 493 U.S. 900 (1989).  In testing the court’s action, we will consider the venireperson’s testimony as a whole.  
Pyles v. State
, 755 S.W.2d 98, 103 (Tex. Crim. App.), 
cert. denied
, 488 U.S. 986 (1988).  A venireperson who is unable to consider the full range of punishment is subject to a challenge for cause.  
Barrow v. State
, 688 S.W.2d 860, 863 (Tex. Crim. App. 1985).  A venireperson is not disqualified merely because he or she could not consider probation under the specific facts of the case being tried that go beyond the elements of the offense.  
Glauser v. State
, 66 S.W.3d 307, 318 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d) (citing 
Sadler v. State
, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998)), 
cert. denied
, 534 U.S. 1129 (2002).  When the record reflects that a venireperson vacillates or equivocates on his ability to follow the law, the reviewing court must defer to the trial court.  
Moore v. State
, 999 S.W.2d 385, 400 (Tex. Crim. App. 1999), 
cert. denied
, 530 U.S. 1216 (2000).

Our review of the record shows that the prospective jurors were able to consider the full range of punishment for the crime of serious bodily injury as defined by the law.  
See Murphy v. State
, 112 S.W.3d 592, 599 (Tex. Crim. App. 2003), 
cert. denied
, 124 S. Ct. 1660 (2004); 
Sadler
, 977 S.W.2d at 142 (stating that jurors must be able to consider the full range of punishment for the crime as defined by the law). Because death of the victim is a specific fact that goes beyond the elements of the offense of serious bodily injury, the venirepersons were not required to consider probation for that specific fact scenario.  
See Glauser
, 66 S.W.3d at 318.  Thus, their feelings regarding whether they could give probation if the child died did not disqualify them as jurors as a matter of law.  
See Faulder
, 745 S.W.2d at 339-40.  Upon reviewing all the challenged venirepersons’ responses, we conclude that the trial court did not abuse its discretion in overruling the challenges made for the inability to consider the minimum range of punishment.  
See Williams
, 775 S.W.2d at 537; 
Chapman v. State
, 838 S.W.2d 574, 579 
 (Tex. App.—Amarillo 1992, pet. ref’d).  Consequently, we overrule New’s second issue.

IV.  Sufficient Evidence of Intent

In her third issue, New argues that there is insufficient evidence to establish her mental intent to commit the offense of injury to a child.
(footnote: 4)  The State responds that the evidence was legally and factually sufficient to prove that New intentionally or knowingly caused serious bodily injury to Kobe. 
A. Legal Sufficiency Standard of Review 

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In determining the legal sufficiency of the evidence to show appellant's intent, and faced with a record that supports conflicting inferences, we “must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution.”  
Matson v. State
, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

B. Factual Sufficiency Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

C. Serious Bodily Injury to a Child

The first-degree felony of injury to a child is committed when a person intentionally or knowingly causes a child serious bodily injury.  
See
 
Tex. Penal Code Ann.
 § 22.04(a)(1), (e) (Vernon 2003).  Injury to a child is a result-oriented offense.  
Johnson v. State
, 121 S.W.3d 133, 135 (Tex. App.—Fort Worth 2003, pet. ref’d).  A person acts intentionally with respect to the nature of her conduct or to a result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result.  
Tex. Penal Code Ann.
 § 6.03(a) (Vernon 2003).  A person acts knowingly with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result.  
Id.
 § 6.03(b).

D. Testimony Received at Trial

Charles House with the Dallas Fire Department dispatch testified that he received a 911 call on February 15, 2003 from New involving an emergency with a child.  He stated that he never advised New to do chest compressions on the child.

Johnny Rudder, a Dallas Fire Department paramedic, testified that he responded to a call involving an unconscious child or baby on the date in question.  When he arrived at the apartment, the sick child was lying on the living room floor, not moving.  New was very quiet and was not near the child. Rudder went to the child and saw that the child “was not really moving much, was not breathing adequately enough for his age.  Seemed to be unconscious and not really with it.”  He noted that the child’s pupils were sluggish and did not seem very reactive to light.  He noticed a bruise on the child’s chest and asked from where it had come.  New responded that she had done chest compressions; however, Rudder knew from his training that bruises do not develop that quickly. 

On the way to the hospital, New rode in the front of the ambulance.  Once they arrived at the hospital, Rudder noticed bruises on the child’s back. New told him that she was in the other room while the three children were playing, and she heard a noise like something dropping or falling.  She went in and found Kobe like the paramedic saw him.  She said that his hair was wet because she put him under water to revive him.  Rudder further testified that New did not try to gain access to the child while they were working on him, and he commented that normally it is difficult to get parents away from kids who have been injured.

April Miller, a paramedic with the Dallas Fire Department, testified that she responded to an unconscious person call on February 15, 2003.  She found a child lying in the middle of the floor, and two other children were around the child.  She said that New had a blank look and thought New’s demeanor reflected that she was frustrated that something was wrong and did not know what it was.  New told Miller that New was in one room and the children were in another room playing; they told her that something was wrong with one of the kids.  When New went into the room where the children were playing, she found Kobe on the ground.  Because Kobe was not breathing, New said she gave him CPR.  New said that she thought Kobe’s brother hurt him. 

Miller testified that New stayed in the background while the paramedics worked on Kobe.  When Miller noticed that Kobe’s breath sounds were shallow and that he had a bruise on his chest, New stated that she had performed CPR on him.  Miller said that on the way to the hospital, New never looked through the window to check on Kobe in the back of the ambulance.  However, New did ask if Kobe was going to be okay. 

Tim Lennington of the Dallas Police Department testified that Kobe was already in the ambulance when he arrived at the scene.  He got New’s name and Kobe’s name before the ambulance left and then looked around the apartment because the Dallas Fire Department was still there.  He noted that the bathtub was wet and that there was a towel on the floor next to the bathtub.  He also noted that the apartment was messy, but he did not see any cleaning materials in plain view. 

Later, Lennington went to the hospital and spoke with New.  She told him that she was in the bedroom cleaning, and the children were in the living room playing.  She heard two or three thumps on the floor and went to see what happened and found Kobe on the floor, passed out.  When she picked him up, his eyes were rolling back in his head, so she ran water over his head to wake him up and then called 911.  Lennington described New’s demeanor at the hospital as quiet and kind of puzzled.  He noted that New asked how Kobe was doing, but she never asked to stay with him.  He talked to the doctors and nurses in the emergency room, and they showed him some of Kobe’s injuries. He began to suspect child abuse and called the child abuse detectives.

Kim Vasquez, the charge nurse at Presbyterian Hospital in Plano (Presbyterian Plano), testified regarding Kobe’s condition when he arrived at the emergency room on February 15, 2003.  She stated that he was unresponsive for the most part and responded only to a painful stimulus, was pale, had multiple bruises in various stages of healing, exhibited abnormally low neurological functioning, and had an inadequate respiratory rate.  She explained that the medical team intubated Kobe, gave him oxygen, and started an i.v. to give him medications.  Because Kobe’s condition was critical, the medical team transferred him to Children’s Medical Center in Dallas and notified the police and CPS.

Nurse Vasquez spoke to New, who said that Kobe was in a room playing with his siblings when she heard a thump.  New explained that she went to see what the noise was and found Kobe unconscious on the floor.  New stated that she did not know what caused the bruises on Kobe.  Nurse Vasquez noted that New did not try to approach Kobe while he was being treated; that she seemed frightened, not in a shocked state; and that she never cried.  

Dr. Ted Wen, a pediatric radiologist and the medical director of radiology at Presbyterian Plano, testified that he saw Kobe’s CAT scans from February 15, 2003.  The CAT scan of Kobe’s head showed a sizeable fracture that went to the base of the skull, despite the fact that children’s skull bones are fairly flexible.  After reviewing the CAT scans, Dr. Wen was concerned about the amount of blood throughout Kobe’s brain.  Because the child’s x-rays did not indicate that he was malnourished or that he had any kind of bone disease and because there was no history of known trauma, Dr. Wen ordered a skull survey and alerted the proper authorities. 

He stated that it would take “a direct blow against a hard surface of a significant force” to cause Kobe’s skull fracture.  He would expect that injury on a very hard surface, like tile or concrete; he would not expect that type of injury with a child just falling down on a concrete floor covered with very thin carpeting.  He stated that it would be more like if a person had taken a child and slammed his head on that surface.  He said that this type of fracture is seen with severe auto accidents in which children are not belted or not in a car seat; with falls from two- to three-story buildings; with direct blows to the skull with a hard, blunt instrument; or with shoving the skull against a hard object like a corner.

Dr. Dale Swift, a pediatric neurosurgeon at Children’s Medical Center of Dallas, testified that he was on call when Kobe came to the emergency room. When Kobe arrived, he was not breathing, had a tube in his trachea and was being mechanically ventilated, had no reaction to touch, and had dilated pupils. After seeing the CAT scans, which showed that Kobe’s brain had shifted and that there was blood over the surface of his brain, Dr. Swift took Kobe immediately to the operating room.  He stated that because Kobe’s pupils were dilated and not reacting to light, it is conceivable that he was brain dead at that time.  However, he wanted to give Kobe every chance possible, so he took Kobe to the operating room to relieve the pressure on his brain.  After Dr. Swift cut a hole in Kobe’s skull to let the blood out, he had trouble finding the source of the bleeding because the source was deep.  During the surgery, Kobe’s heart stopped because he was bleeding to death, despite the fact that he was given many transfusions.  The doctors did chest compressions and eventually pronounced Kobe dead.  

Dr. Swift said that in his opinion, whether they did the surgery or not, Kobe would have died.  He explained that Kobe’s heart’s stopping was a function of the head injury that led to brain damage and bleeding.  Dr. Swift pointed out to the jury the “straight-through crack”—a full thickness fracture through the skull, from the top of the skull to the base of the skull—on the CAT scans of Kobe’s skull and stated that it would take a significant amount of force to fracture a child’s skull bone.  He said that the force needed to cause the fracture would be a substantial force ending in a blow against a hard object.  He testified that most of these injuries that are this severe result from a high-speed or vehicle accident, a fall from the third story of a building, or a hit by a baseball bat if it is swung hard enough.  He stated that a child could not normally cause this type of injury to another child.  He concluded that a possible hypothetical might involve someone slamming a child into the floor. Dr. David Dolinak, deputy chief medical examiner at the Dallas County Medical Examiner Department, testified that he performed the autopsy on Kobe. He determined that the bruises on Kobe’s front side were three to four days old by examining the tissue under a microscope.  He explained that the bruises on Kobe’s back could not have been inflicted by a one- to three-year-old child and that the bruise on Kobe’s chest was not from CPR because there were multiple bruises in that area extending to the shoulders and arms.
(footnote: 5)  He noted a large, severe fracture that went completely through the bone on the back of Kobe’s head and stated that it is not unusual to sustain massive head trauma inside while having no external injuries.  He also noted a bruise in Kobe’s lower lip and stated that it was from a blunt force injury.  He further stated that the injuries revealed evidence of more than one impact because of the separate bruises. 

Dr. Dolinak said that Kobe’s injuries are consistent with someone taking a child and slamming his head onto a hard surface.  He normally sees this type of injury result when someone has either slammed or otherwise caused an infant to collide with another surface.  He ruled Kobe’s death a homicide. 

Detective Kimberly Mayfield, who works in the child abuse unit of the Dallas Police Department, came into contact with New at Presbyterian Plano after being contacted by her sergeant to respond to a situation involving an injured child.
(footnote: 6)  She learned that New was Kobe’s stepmother.  New gave the following explanation to Detective Mayfield:  New was in her bedroom and heard a loud thump; she went into the living area and found Kobe on the floor; and she guessed that Kobe had climbed up onto the table and Isaiah (the other boy in the home) had pulled Kobe off the table. 

After gathering the above information at Presbyterian Plano and obtaining New’s written consent to search her apartment, Detective Mayfield went to New’s apartment to determine how Kobe was injured.  New did not request to go to Children’s Hospital; instead, she went with Detective Mayfield.  When they arrived at the apartment, they had to wait for maintenance to come unlock the apartment because New did not have a key.  While they waited, Detective Mayfield asked New to write out an affidavit of fact, and she wrote a little less than a page-long affidavit.  After Detective Mayfield and Detective Fite
(footnote: 7) read the affidavit, they requested that New write another statement with more details, and New agreed.

After maintenance arrived and unlocked the apartment, Detective Mayfield found some unusual things.  For instance, New mentioned at the hospital that there was a broken toy construction hat with blood on it, but it was not broken and had no blood on it when Detective Mayfield saw it at the apartment.  Detective Mayfield also noticed a belt on the stove and a bed roll down in front of the couch.  It also did not appear that anyone had been cleaning the apartment.  After the walk-through was completed, New became a suspect and was taken to the police station, where she gave a third written statement. 

Detective Mayfield testified that during the entire evening, New asked only once how Kobe was doing.  However, after giving her third statement and being told that Kobe had died, she broke down. 

Detective Elton Fite with the Dallas Police Department’s child abuse unit testified that he received a call to respond to Presbyterian Plano regarding possible abuse of a two-year-old child.  He echoed Detective Mayfield’s testimony about obtaining consent from New to search the apartment, New’s not asking to go to Children’s Medical Center to be with Kobe, waiting for someone with a key to unlock the apartment, requesting that Detective Mayfield have New amend her first written statement to give more detail, and New’s complying and giving another statement. 

During the walk-through of the apartment, New told Detective Fite that the children were in the living room watching television and that she had gone into the bedroom to clean up when she heard a loud thumping sound.  New said that she walked into the living room and found Kobe unconscious, lying on the floor.  Detective Fite described the apartment as being on the ground floor and having worn carpet throughout, except for vinyl flooring in the bathroom and tile on the hearth.  Like Detective Mayfield, he noted that the toy hard hat was not broken or bloody and that it did not appear that anyone had been cleaning in the bedroom.  Moreover, Detective Fite stated that New was the only adult in the house with the kids at the time of Kobe’s injury. 

Detective Fite explained that New became a suspect after the walk-through because she was the only adult at home when Kobe was injured and because the injuries Kobe received did not coincide with New’s version of the events. New agreed to go to the police station and talk more.  After being read her rights, Detective Fite told New that Kobe had a skull fracture that could be caused only by receiving a severe blow to his head, that her account of what had happened did not coincide with the type of injury he had received, and that no child could have caused Kobe’s injury.  New gave a third written statement at the police station in which she admitted hitting Kobe’s head on the floor.  After New signed the statement, Detective Fite told her that Kobe had died. 

Detective Fite testified that Kobe died from “something that was used by [New].”  He stated that the toy construction hat and the furniture did not account for the extent of Kobe’s injuries because he did not see anything protruding from the couch that posed a danger.  He confirmed that the floor or a hard object can be a deadly weapon.  However, he did not take any floor samples or go back to the apartment to search for a weapon.

The defense’s sole witness was Teresa Godinez, whose daughter has been friends with New since they were nine years old.  She testified that New is a great mom who took good care of her kids.  For example, she said that New paid attention to them; played with them; gave them fun things to do; spent time with them; showed a lot of love to them by telling them that she loved them and by giving them kisses; made sure that they had food, clean clothes, and baths; and made sure that they went to the doctor if they needed medicine.  She stated that New does a good job with children other than her own and that she did well with Kobe.  She said that Kobe was a little wild but that he actually liked New.  On cross-examination, she agreed that the little boy in the autopsy picture did not look well cared for.  She concluded her testimony by stating, “This is not Angela.”

E. Sufficiency of the Evidence

Here, New contends that the only evidence offered by the State regarding her actions was the statements that she gave to the police.  Although the record shows a substantial amount of circumstantial evidence, New’s confession, standing alone, would have been sufficient for a rational jury to find that she intentionally or knowingly caused serious bodily injury to Kobe because she admitted, “I can see what I’m doing.”  
See Spang v. State
, 781 S.W.2d 713, 715 (Tex. App.—Austin 1989, no pet.) (holding that jury could reasonably conclude from appellant’s confession that he intended to cause serious bodily injury or that he was aware that his conduct was reasonably certain to cause such injury); 
see also Allen v. State
, 478 S.W.2d 946, 947 (Tex. Crim. App. 1972) (stating that knowledge and intent can be inferred from conduct of, remarks by, and circumstances surrounding acts engaged in by an accused).  This statement alone reveals that New had knowledge of what she was doing and should have been aware of the potential for serious bodily injury where she was hitting or shaking Kobe with such force that his head repeatedly struck the floor.  
See 
Tex. Penal Code Ann.
 § 6.03(b).

In addition, the modality of injury that New expressed in her confession (i.e., Kobe’s head hit the floor as she was shaking him) coincided with the medical evidence.  For example, Dr. Wen and Dr. Swift testified that the force needed to cause Kobe’s fracture would amount to a substantial force ending in a blow against a hard object or surface, and Dr. Swift and Dr. Dolinak both testified that the injuries Kobe received are consistent with someone taking a child and slamming his head onto a hard surface, like the floor.  Also, Detective Fite testified that the floor can be a deadly weapon.  Moreover, the medical evidence ruled out the possibility that Kobe’s injuries could have been self-inflicted or caused by a child, and the evidence demonstrated that New was the only adult at home when Kobe’s injuries occurred.  Furthermore, the bruises in various stages of development on Kobe’s body showed that the abuse was not an isolated incident and contributed to an inference of intent.  Therefore, the jury could reasonably have inferred New’s intent from the extent of Kobe’s injuries.  
See
 
Lindsey v. State
, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973) (stating that intent may also be inferred from extent of injuries and relative size and strength of parties), 
cert. denied
, 416 U.S. 944 (1974); 
see also Davis v. State
, 955 S.W.2d 340, 349 (Tex. App.—Fort Worth 1997, pet. ref’d) (stating that proof of culpable mental state generally relies on circumstantial evidence)
.

The evidence also revealed consciousness of guilt on the part of New through her actions immediately following the commission of the crime.  For instance, New remained unaffected emotionally and uninterested during most of the time that Kobe was being treated for his serious injuries, despite the fact that she was Kobe’s stepmother.  Also, New told each person who questioned her a slightly different version of the events involving how Kobe was injured. By changing her story, the jury could have concluded that New lied because she had something to hide.  
See Couchman v. State
, 3 S.W.3d 155, 163-64 (Tex. App.—Fort Worth 1999, pet. ref’d).

Thus, viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Ross
, 133 S.W.3d at 620; 
see Dunn v. State
, 13 S.W.3d 95, 98-99 (Tex. App.—Texarkana 2000, no pet.) (holding that evidence was legally and factually sufficient to support findings that defendant either acted with intent to cause serious bodily injury to child or knew that his actions were reasonably certain to cause that result where defendant’s mental state was proved circumstantially).  Furthermore, viewing all the evidence in a neutral light, favoring neither party, we also conclude that the evidence supporting the verdict, taken alone, is not too weak to support the finding of guilt beyond a reasonable doubt and that the contrary evidence is not so strong that guilt cannot be proven beyond a reasonable doubt.  
Dotson v. State
, 146 S.W.3d 285, 295 (Tex. App.—Fort Worth 2004, no pet.); 
see Kemmerer v. State
, 113 S.W.3d 513, 515-16 (Tex. App.—Houston [1st
 Dist.] 2003, pet. ref’d)
 (holding evidence factually sufficient to show that appellant intentionally or knowingly caused bodily injury to child and stating that jury was free to believe State's evidence and to discount contrary evidence).  Accordingly, we hold that the evidence is both legally and factually sufficient to support New’s conviction for intentionally or knowingly causing serious bodily injury to a child.  We overrule New’s third issue.

V.  Photograph Properly Admitted

In her fourth issue, New contends that the trial court erred and abused its discretion by admitting photographs that were more prejudicial than probative. Specifically, New complains about a studio portrait of Kobe that was admitted by the State and displayed to the jury throughout final arguments.  The State responds that the trial court did not abuse its discretion by admitting a photograph of Kobe before his death. 

The admissibility of a photograph is within the sound discretion of the trial judge.  
Williams v. State
, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997).  The Texas Court of Criminal Appeals recently revised the policy for determining what photographs are admissible during criminal trials:

What we can glean from a thorough review of the relevant authorities is that a photograph must be relevant[;] thus, it must be 
helpful
 to the jury.  Like other demonstrative evidence, photographs should assist the jury with its decision, whether that be deciding guilt or punishment.  A photograph should add something that is relevant, legitimate, and logical to the testimony that accompanies it and that assists the jury in its decision-making duties.  Sometimes this will, incidentally, include elements that are emotional and prejudicial.  Our case law is clear on this point:  If there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects.

Erazo v. State
, 144 S.W.3d 487, 491-92 (Tex. Crim. App. 2004).  A court may consider the following factors in determining whether the probative value of any photograph is substantially outweighed by the danger of unfair prejudice:  the number of photographs; the size of the photographs; whether the photographs are in color or black and white; the detail shown in the photographs; whether the photographs are gruesome; whether the body is naked or clothed; and whether the body has been altered since the crime that might enhance the gruesomeness of the photographs.  
Reese v. State
, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000).

The picture complained of in this case is helpful to the jury because it shows what Kobe looked like prior to his injuries, while the bulk of the testimony at trial focused on what Kobe looked like after his injuries.  Thus, the photo assisted the jury in determining whether Kobe had any visible birth defects or diseases that would provide a different explanation for any of his injuries. Additionally, only one photograph is at issue—an eleven-by-sixteen-inch color portrait of Kobe at age two.  The portrait shows his physical features in explicit detail.  Kobe was fully clothed; thus, the photograph is not gruesome.  And, because the photograph was taken before Kobe’s death, it did not show his body as it looked after the crime.  Consequently, the photograph was not more prejudicial than probative.  
See Gordon v. State
, No. 05-02-00865-CR, 2003 WL 1494977, at *3 (Tex. App.—Dallas Mar. 25, 2003, pet. ref’d) (holding that photograph of victims taken before death was not excludable as prejudicial when it was relevant to prove their appearances before their deaths, allowed jury to have mental impression of victims, and was only photo offered depicting victims before death) (not designated for publication).  Furthermore, Kobe’s birth mother identified the person in the photograph as Kobe, testified that he was about two when the photograph was taken, and explained that the photograph was a true and accurate depiction of what he looked like at age two; this testimony came in without objection.  
See Tanguma v. State
, 721 S.W.2d 408, 413 (Tex. App.—Corpus Christi 1986, pet. ref’d) (holding that there was no abuse of discretion by trial judge in admitting photograph of deceased before death when medical examiner’s verbal description of deceased’s appearance and build was admitted without objection).

Moreover, to the extent that New complains that Kobe’s picture is more prejudicial than probative for the opposite reason—that Kobe’s picture is not gruesome but is too cute—we hold that the trial court did not abuse its discretion by admitting the picture.  Kobe was the victim of the offense.  The jury was entitled to know his identity, including his physical appearance, as a relevant fact in the case.

Based on the analysis of the factors set forth above, we cannot say that the trial court abused its discretion by admitting a single studio portrait of Kobe taken before his death.  Therefore, we overrule New’s fourth issue.

VI.  Conclusion

Having overruled each of New’s four issues, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL B: HOLMAN, WALKER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: February 3, 2005

APPENDIX

The following includes examples of the questions raised by New’s counsel during voir dire pertaining to the death of the child:

Now, we haven’t discussed the facts in this case, and as the Judge said, I’m not allowed to, and I’m not going to.  And we all know that cases involving child abuse can run a gamut of different types of abuse.  There can be purely mental abuse where there’s no physical contact whatsoever, and it can run the entire gamut to physical abuse of very slight bruising to, as the court has talked about, serious bodily injury--and I’m going to talk about that in just a minute--all the way up to and including death of a child, okay?

Now, my question to you is, if knowing that this case involves injury to a child, does it change anyone’s thought or perception about . . . this case, understanding that the range of this case and facts of this case could go anywhere from just no physical contact and maybe mental abuse all the way up to and including death of the child?

And am I making myself clear?  I’m getting a lot of puzzled looks here.  Do y’all understand my question?  Okay.  So if allegations of injury were, you know, just merely physical, you know, slight bruising or something like that, you could sit objectively, listen to this case the same as if it went all the way up to and including death of a child?  That would not change anybody’s perception?

. . . .

We were talking about a potential range of evidence in this case which could go anywhere from, like I said, a case of mental abuse where there’s no physical conduct all the way up to severe physical abuse, all the way up to and including death of the child.  Okay.  I take it by your silence, then, that irregardless of what range could be alleged by the State that you could fairly and impartially sit and listen to the evidence, and that that range would not affect you other than to weigh the evidence fairly and impartially.

Okay.  Thank you.

. . . .

All right.  Now, previously I had asked you about--we talked about the fact that child abuse cases can run a complete gamut in the case.  And as the State has told you earlier, the range of punishment in this case could be anywhere from five years’ probation, or if it were--if the case were proven in a different fashion, go down to a state jail felony, which would be five year’s probation also--yeah, five years’ probation all the way up to 99 or life.  Okay.

And I guess my question--follow me close here because I want to make sure everybody understands what I’m asking here.

My question is, could you consider the entire range of punishment, be it five years’ probation or all the way up to life irregardless of the type of case?  By that I mean whether it be slight abuse or all the way up to and including death of the child.  Okay.  Everybody understand my question?  Okay.

. . . .

Does everybody understand my question here?  There’s an entire range of criminal activity here that could be considered injury to a child and involve multiple types of intent and multiple types of bodily injury.  And serious bodily injury can go anywhere from a minor impairment all the way up to a severe, extreme impairment, broken bones, whatever, all the way up to and including death.  What I’m asking y’all, if you can find the full range of criminal activity, can you still apply the full range of punishment in this case?

. . . .

So if it included the death of the child, you would still consider probation, right, not just murder?

. . . .

If the State were to prove--and you understand that the definition of serious bodily injury can include a substantial risk of death, serious permanent disfigurement, and up to and including death of a child?

. . . .

If they were to prove that intent, would you automatically chop off the low end of the punishment?

FOOTNOTES
1:
New’s counsel explained that had an additional peremptory challenge been granted and had Mr. Wilson been excused, he “would have selected and struck Mr. Shivers, and number 49, or Mr. Smith, or juror number 7, Ms. Spalding in this case . . . for the reasons that they had expressed, that they were involved with the State.”  He also requested additional peremptory challenges after making this statement, and the trial court denied his request.

2:
New argues that she was not able to ask the venire panel about the death of the victim; she contends that the venire members brought up the issue on their own.

3:
In determining whether the trial court abused its discretion by denying a challenge for cause, we first consider whether New preserved error by demonstrating that (1) she exhausted all of her peremptory challenges, (2) the trial court denied her request for additional peremptory challenges, and (3) an objectionable venireperson upon whom she would have exercised a peremptory challenge was seated on the jury.  
See
 
Coble v. State
, 871 S.W.2d 192, 201 (Tex. Crim. App. 1993), 
cert. denied
, 513 U.S. 829 (1994).  The record demonstrates that New followed the steps to preserve any potential error, so we proceed with determining whether the venire members of whom she complains were biased and challengeable for cause.

4:
Although New only asks this court to reverse her conviction, she addresses both legal and factual sufficiency.  Because legal insufficiency results in an acquittal, we will address both legal and factual sufficiency.

5:
Although he could not testify to the handling of the body during transport to his office, Dr. Dolinak said that postmortem bruising “would be pretty rare.”  

6:
Detective Mayfield knew that Kobe had a head injury and had been transported to Children’s Medical Center. 

7:
Detective Fite’s testimony is set forth below.